Case number 16-1632, Earline Young et al. v. UAW and General Motors. Argument not to exceed 15 minutes for the plaintiffs, 15 minutes to be shared by the defendants. We have Mr. Myers. You may proceed for the appellants when you're ready. Good morning. May it please the court, my name is Ken Myers. I'm here on behalf of the plaintiffs' appellants in this case. I'd like to reserve three minutes. This is a case that involves some former workers of the Delphi Company, which was a subsidiary, a supplier of GM. And there were agreements between Delphi, the UAW, and GM, which allowed them, which anticipated them and some other suppliers to flow into GM at a certain point. And the issues in this case involve two separate groups of people. There's six appellants that had formerly worked for GM, and then there's 39 who had not. They all ended up at GM in 2009, and so we've got sort of two paths here. The path for the six, I think, is more obvious because they had promises made to them as former GM employees, and the question is they took a buy-down to help Delphi in 2006 try to get over its financial problems, which of course were not successful. And what did they give the company in return for the three-year payment? Their salaries were reduced. I mean, are they, in exchange for, I think it was $105,000, is that right? Isn't it correct that what they're giving the employer in return is reduction in status to Tier 2 rather than Tier 1? That's my argument that that's not the case, Your Honor, that there's no document that says that. There's no document that says what happens at the end of the three years. During the three years, they take, after the three years, they, at least what you're, the position is they took, then they go into a lower salary, Tier 2. No, my position is they should have gone back up to the Tier 1. I know that's your position. I don't understand why, I mean, how does that make any sense, that they're going to take a buy-down, so they get paid a pretty large lump sum over three years, and then at the end of those three years, after they get the $105,000, they just go back to their original salary? Why would any company ever do that? The exchange was they took a lower salary. It was basically front-end money for Delphi to save money at the time to try to help them out, which obviously didn't work. But then when they moved to GM, there's nothing, they still had their seniority. They still had GM's seniority. So there's no document that says, well, we take our seniority employees, we lower their wages in exchange for a lump sum, and then we just leave them at the lower level. I mean, they had, in all other ways, they still had their seniority at GM. What does seniority get you? May I ask that? You say they had seniority. What does seniority get for an employee? We want to know, does that convert to money? Part of it does. There are other aspects. When you say they kept their seniority, you mean with that seniority, one gets Tier 1 wages. Is that what you mean? Yes. Okay. I mean, seniority doesn't have an inherent meaning to us. But to auto workers in the UAW, it has a tremendous meaning. But we don't know what it is, so maybe you could tell us. It has to do with not only salary levels, but benefit levels, and also the key thing is bumping rights. Compensation and bumping rights. Right. Okay. Right. So, Judge Kethledge, you asked a question of why would a company do that. And so, I mean, I think that's a very valid question because if – I think there's this assumption out there that, oh, well, it's so obvious that we don't even have to write it down. What's so obvious? It's so obvious that they're going to stay at the lower rate after the three years. Why would they not put it in writing? They write everything down to the T, and there's these two large groups that are negotiating, and there's this group of employees who are third-party beneficiaries to these contracts, and they're kind of left hanging at the end of the three years. That's your best argument, I take it, that it wasn't written anywhere, that they shouldn't return to their former status. Well, no, my best argument is that in the 2007 restructuring agreement, there's language that one could interpret allows them to come back because it says in there that Delphi employees that go to GM who had been at GM revert back to their seniority. They take their seniority with them. So that gets back to your earlier question. What were Tier 1 wages based on to begin with? The Tier 1 wages were based on the negotiated rate between the UAW and GM, which were about – It wasn't seniority-based, right? No. Not until 2007. Right. Originally, until the buy-down, the wage rate for Tier 1 employees was not based on seniority. Seniority got you things like priority with respect – bumping rights and – Probably work, jobs. Probably other things, opportunities to bid on other jobs. But it didn't get you the Tier 1 wages, right? And so why do you insist now that it would affect the wages? Because there was no such thing as Tier 1 or Tier 2 wages before 2007. If you were a full-time employee of either GM or Delphi prior to 2007, you got the one wage. Yeah, but it wasn't based on seniority. Correct. Okay. Right. So why would it be based on seniority now? Because in 2007, they wrote all these new rules that included grandfathering some people in and listing some people. Is it fair to say that the fact that they retained their seniority is more an argument that shows that it was meant to be temporary than an argument that somehow seniority affects wages or did affect wages previously? I'm a little unclear, Your Honor. Well, I just think – I think you might have the retention of seniority in the wrong place in the analysis. It seems to me you can't argue really – perhaps that maybe you can, but maybe there'll be more in the record at a later time. But based on what you just told me, it doesn't seem like there's a viable argument that seniority affected wages. So maybe the significance of retention of seniority is more that it has some tendency to suggest that the agreement was intended to have an expiration date, the buy-down agreement. Well, I think, Your Honor, that there's not going to be any dispute that these employees retained their seniority. The question is what does that mean? I understand that. Okay. I'm not sure I answered the question because I'm not sure that I understood it. Well, I'm sorry. If I can ask you a question on a little different subject. A section or a hybrid 301 action is a very unusual kind of action. You have to show – in this case, you would have to show not only that General Motors breached the collective bargaining agreement or one of these agreements, but also that the union breached its duty to represent your clients in good faith, right? Right. And if you don't show both of those things, you don't recover in a 301 action, right? Right. And to show that the union breached its duty as to you in this case, you would have to show that the union's interpretation of these contract provisions was, and I'm quoting from the case, arbitrary, discriminatory, or in bad faith. Is that fair? That's the language, Your Honor. And so, I mean, this is an unusual case of contractual interpretation in the sense that we don't sort of just look at it and try to figure out what is the best interpretation. Instead, we have to bring really a lot of deference to the union's interpretation and ask simply whether that was arbitrary. Is that a fair characterization? I think that's right, Your Honor. I appreciate your straight answers. I really do. And I understand coming in the steep hill I have to climb in these 301 cases. It's also why I plead separately on count two, a count against the union that's separate from the 301 because there's, I think it's, I always get the numbers mixed up, 1459 that says that independent of the contract, the union still has a duty of fair representation. So that even if you were to rule that the contract, either it wasn't breached or it wasn't clear that the union had a duty under that statute, they have an independent duty to treat their members fairly outside the context of the contract. So I think I actually kind of get two bites at the apple against the union. Yeah. But to try to climb that hill a little bit for you, Your Honor. And let me just tell you what my concern is. Sure. Okay? And then please do whatever you want to do. I mean, you candidly agree in your brief that there is no specific contract language either way as to how your six-year clients, I think, should have been treated. And if there's no language either way, how can we say that the union's interpretation of that silence was arbitrary? Because I think, Your Honor, that the union, I mean, take a step back here. The union's job, obviously, is to represent all its members. And they've got these group of people from Delphi that are in a little different category than a lot of their members. And I think that when all was said and done, when all the smoke cleared from all these agreements and these supplements and everything, they left these people hanging out there. They just left them hanging out there. And when the people complained, the Delphi employees complained, they just put them into this appeal system, which is unending and it's ambiguous and it's controlled by the union. And the first thing they're telling them, you don't have a claim. Then they're saying, you do have a claim. We're going to appeal it. We're going to grieve it. Then we're not. Then out of nowhere, they just dismiss it. And four years later, these people have no remedy. And so I think part of it goes to the general way these things are treated, where any time a group of people like these people who were in a different category complain, the system is more geared toward putting them off and stalling them off than investigating their claims. There's no evidence that the union really ever did any serious investigation. Their whole position was, look, we were in these contracts, so we're going to defend our role in having negotiated these contracts. And so that's the context I think that you have to look at. All right. I understand your argument. I think I'm about out of time for this round. Thank you, sir. Ms. Cato, you and Mr. Abbott are splitting your time evenly, correct? Yes, that's correct, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. Mami Cato for the Defendants' Appeals, UAW International Union and Local 651. In an effort to be more efficient, Mr. Ebert and I have agreed that I will address the dismissal on the basis of statute of limitations, which quite frankly got rid of 91 of the 93 plaintiffs, as well as the district court's dismissal of count two for the independent duty of fair representation. And I'll leave for Mr. Ebert to deal with the contract issues that Your Honor has been discussing with Mr. Myers. So would you start with addressing the equitable estoppel argument? Absolutely, Your Honor. To back up a little bit, the law is clear on this. It is a six-month statute of limitations with respect to hybrid 301, as well as duty of fair representation, whether that be in independent context or the 301 context. So within that six months from the time it starts to run, and if I may back up a little bit, the case is also clear that it is triggered when the union makes- I don't think my question so much concerns the triggering. That's been- I think that there's pretty much agreement about the triggering. The question asks that you address why the filing doesn't cover the 39 people. Sure. When you say filing- It's the signed by two people, right? Absolutely.  Yes, absolutely, Your Honor. First of all, the equitable tolling, the six-month statute may be tolled if the internal union appeal is diligently pursued, and that's been a Sixth Circuit case law on that. The UAW constitution, as Judge Cook pointed out, requires physical original signature of the appellant to notify the UAW who exactly is seeking an appeal. Now, in this case, we do not dispute that two plaintiffs, Marshalls and Anstetson, did file an appeal that complies with the requirement that the appeal has some context, that it is signed by the appellant, and specifies the action that they are challenging. What we're saying is that because of the physical signature requirement, 91 plaintiffs and 43 appellants here did not exhaust their internal union remedies or let alone even invoke it within that six-month statute limitations period. Now, I understand- Kato, would you agree that in this appeal, we have to decide this issue based on the pleadings? Yes. And, I mean, don't they plead that the UAW, as a practical matter, treated this as a group appeal rather than an appeal just for those two persons? Not exactly, Your Honor. In that, I believe the plaintiffs are confusing the grievance procedure and internal union appeal procedure, which is very different. There's no question the grievance procedure- Okay, I'm sorry. You go ahead. No, I'm sorry. No, you go ahead. The grievance procedure was treated as a group grievance, and that is permitted because the GM would agree to let UAW grieve the issue as a group grievance without requiring individual signature. So the grievance procedure is governed by the collective bargaining agreement because it is a dispute between the employer and the union. But here, the court granted the dismissal of the 43 appellants based on the defense, the affirmative defense filed by the company. Is there a different statute of limitations defense, right? So there's a different standard when the court is granting on a affirmative defense. Is there not? Well, Your Honor, it is, Your Honor. That is correct. It has to be affirmatively shown. Yes, Your Honor. But I think in this case, what we have here is that not only was there a physical requirement for the signatures, but there's nothing, absolutely nothing in those letters. I'm sorry, a letter from March 13th of 2013 followed by two plaintiffs. Right. No, we're talking about how the company, in the various, you know this evidence, in the various exchanges, the company said everyone et al. The company sort of acknowledged that this was filed on behalf of the group of plaintiffs. Oh, Your Honor, I think you're referring to the letter from the International Union. Yes, right. So this is a June 17th, 2015 letter. You tell me the date. That's fine. So that's a denial letter, yes. Yes, it is true that this court discovered that maybe it's their ambiguity. But the problem here is that this is an individual lawsuit filed by, in this case, 43 separate appellants. So we cannot take one individual's tolling of the statute of limitations and impute it on the other. This is not a class action lawsuit. Can you tell me if the distinction between the grievance and the internal union appeal, do we have the documents that would let us read that and see that? I mean, I know this was, the disposition here was on a motion to dismiss, but are those things attached to the complaint in some way? Do we have what we need to see what happened during each? Yes, I believe, Your Honor. It's in the record. The dismissal by the company of the grievance is in the record as well. So that ended the process as far as the GM was concerned. Well, is the constitution, the union in the record? Yes, it is, Your Honor. And how about the various documents that Judge Cook has been referring to? Yes, they're in the record as well, Your Honor. So we ought to be able to look at what we have and determine whether you're accurate about the dichotomy between the two procedures and what happened during each. Yes, I believe, Your Honor. I believe there are sufficient records for this court to make that determination. And if I may go back to Judge Cook's question, the plaintiffs allege that during the time, sometime in the two-year appeal process, not the grievance process, but the appeal process, that several plaintiffs had written to the UAW requesting status update. I think it's significant that they don't identify who and when those requests may have been written. And also, the UAW's receipt letter with respect to two appellants, which was issued three days after the six-month statute of limitation had run, only identifies two plaintiffs. So whatever may have happened, that may have resulted in the et al. Obviously it happened after the six-month statute of limitation had run, and at that point, equitable tolling is not available because that six months has already run. And on that reason, we ask the court to affirm the dismissal based on statute of limitations. And if I may make a very brief moment with respect to independent duty of fair representation. It is separate from 301. Plaintiffs do not get two bites at an apple, as Mr. Myers, this court has made that clear in the Pratt case, in the White case. And you can, if it's rooted in a breach of the collective bargaining agreement, it is a 301 hybrid claim subject to dual requirement. Well done. Thank you, Your Honor. May it please the court, I'm Kim Ebert. I represent General Motors in this case. The district court properly found in this case that there's been no breach of a collective bargaining agreement by GM and also found in the second prong of the 301 that the union had not breached its duty of fair representation in determining that the grievance in this case should not proceed. As has been made clear, the plaintiffs in this case were employees of Delphi Corporation. Delphi was a spinoff of GM in 1999. In the turmoil that occurred in the auto industry in the early 2000s, Delphi ran into trouble. As a consequence of that, Delphi was a supplier to GM. Delphi, GM, and the United Auto Workers entered into a restructuring agreement designed to safeguard Delphi and the Delphi employees. In that restructuring agreement, the existing Tier 1 employees of Delphi were offered a buy-down in which they moved from their Tier 1 status into a supplemental status. It was not a three-year buy-down. They changed their status to supplemental status. In exchange for that, they were paid $105,000. They gave up $8 an hour. So $8 an hour times 2,000 hours is $16,000 a year times three years is $48,000. It doesn't make sense that you'd be paid $105,000 for a $48,000 benefit. There was never any commitment that the folks If I may, what provision recites expressly that they agreed to go to supplemental status? That is in the restructuring agreement itself. Do you recall what it was? I do, actually. Just if you have it handy. It is on page 8 of the 46-page document in which it says, Effective October 1, 2007, all traditional employees will become supplemental employees, capital S, capital E, and will be covered by all provisions of the supplemental agreement, and that is the buy-down agreement, which created the second tier at Delphi. So as a consequence of that restructuring agreement, they moved down. The vast majority of the plaintiffs in this case were already at Tier 2 at Delphi and never had Tier 1 benefits. As another part of the restructuring agreement, GM made a commitment to try to sell or find a buyer for the Delphi-Flint East plant, where the plaintiffs all worked. Under the restructuring agreement, if GM was unsuccessful in finding a buyer for that plant, they agreed to enter into negotiations with the UAW to find a solution to that. As a consequence of not being able to find a buyer, the UAW and GM then did enter into negotiations about what was going to happen to the Flint East employees, and they entered into a memorandum of understanding in February of 2009. That memorandum of understanding said that GM will hire the Delphi employees. They will become GM employees on January 5, 2009, and they would be given a GM seniority date of March 2008. The significance of that GM seniority date regards compensation? Yes. Bumping all kinds of rights? There is language in the restructuring agreement that allowed them to retain their Delphi seniority for purposes of placement in, for example, the grid, the second-tier grid, because it was a staged compensation system. So they didn't start at the bottom. They started in the middle, but they were at Tier 2.  was that at GM, at that point in time, that got you Tier 2 wages. So even for the folks that took the buy-down, they were supplement employees. They came in with a March 2008 GM seniority date, and that seniority date got them Tier 2 wages. The vast majority of the other plaintiffs had never had Tier 1 wages, and it's fairly preposterous that they would suggest that they could, that GM is salvaging their jobs and is going to pay them Tier 1 wages when they were already at Tier 2. The argument seems to be that as soon as that agreement said that you are entitled to be treated like a former GM employee, then there's a Tier 1 compensation level that accompanies that new status as return to GM. Well, they returned to GM, but there was never any commitment as to what their pay grade would be with respect to that. That's something that had to be negotiated by the union. That's the leap that I think we're asked to take by the appellant. Right, that there's never a commitment. Again, in a hybrid 301 case, you have to show the specific breach of an agreement. Of a specific term of an agreement. Yes, and the plaintiffs in this case cannot point to any contract that gave them Title 1 or Tier 1 wages. At best, they can say the document is silent as to what would happen to the folks who took the buy-down. And as the district court properly ruled, the absence of a contract provision does not allow, does not create an entitlement that would sustain a 301 claim. And, you know, if you look at that contractual analysis and the confusion that the plaintiffs try to create by throwing all these documents on the table and say somewhere in here we have the right Tier 1 wages, is, again, the standard, what the union is judged against in terms of the duty as fair representation, the second prong of the test, is they have to show that they acted arbitrarily or in bad faith or in a discriminatory way. Here, the case is, I think the case is clear, there's no contractual right. But even if there's ambiguity as to whether there's a contractual right or not, that is where the union is entitled to deference in its representation to employees. I wonder if I can take you another place. I think we understand that argument. I think we appreciate it. I wondered if you could mention, speak about the denial of the amended, the effort to amend their complaint. Oh, yes. The district court took care to look at all of the arguments the plaintiffs made in their original complaint and then looked at the amended complaint. And the standard to be judged there in looking at that amended complaint is to whether it would be a futility. And we believe that the court properly found that taking into account all of the other documents that were referenced in the amended complaint, there still is nothing there that would sustain a claim either for a breach of contract or a breach of the duty of fair representation. That being the case, it doesn't matter whether the contract is amended or not. It's going to be a futility. So for all these reasons, I believe that the district court properly found in this case that the plaintiffs have failed to establish either prong of the duty of fair representation for a hybrid 301 case and as such properly dismissed the claims in this case. Thank you. On the statute of limitations issue, the union seems to want to have it both ways. They want to say we should be entitled to deference to rely on the language of our constitution  And then they want to say, well, but we interpret it one way for purposes of the internal appeal. But when we get to federal court, we've got different lawyers and they can say something else. They can raise issues that weren't raised for four years during the appeal process. They accepted this group grievance, which became a group appeal on behalf of all of these people for four years. And then they want to come back to court and say, well, now we wrote into the new constitution, which took place while this was happening in 2010, this individual signature requirement. I think that they've waived that, and they've waived it by the terms of their own constitution. So they shouldn't be allowed to change the argument after accepting all of these plaintiffs for all that time. On the issue of the independent DFR claim, it's obviously not dispositive on this court, but there's a case that's working its way up called COSA versus UAW, where the judge did say there wasn't a 301 claim, but he did allow an independent DFR claim to go forward through past summary judgment. So in that case, it's actually getting ready for trial. So there is some precedent for that issue. Did that involve a collective bargaining agreement? Pardon? Did that claim that went forward, I mean, did that case involve breach of a collective bargaining agreement? Yes. What the judge ruled there was that independent of that, the union misled the plaintiffs in terms of what their options were regarding some options in an MOU. What would be the analog to that here in your view? The analog here would be the union saying to the plaintiffs, basically misleading them as to the status of their grievance, which then ran out the clock presumably for statute of limitations purposes. If they say, you know, either lull them into a false sense of security by saying the grievance is still pending or not, then all of a sudden their time is up because now they're arguing statute of limitations, and up to this point successfully. And very briefly, just on Mr. Ebert's issue, I would just, since I'm running out of time, call the court's attention to page 7 and 8 of my initial brief, which lists the portion of the 2007 supplemental agreement that I'm referring to. Thank you. Thank you all for your argument. We'll consider the case carefully.